Filed 4/12/16  3405/3407 Slauson Ave., LLC v. Alessi CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| 3405/3407 SLAUSON AVENUE, LLC, et. al.,<br><br>      Plaintiffs, Respondents, and Appellants,<br><br>      v.<br><br>DAVID A. ALESSI,<br><br>      Defendant and Appellant;<br><br>ROBERT A. KOENIG,<br><br>      Defendant and Respondent. | B255137<br><br>(Los Angeles County<br>Super. Ct. No. BC456795) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Robert A. Koenig; Hess, Hess & Herrera, Alejandro H. Herrera, for Defendant and Appellant David A. Alessi.

Jacob N. Segura, a Law Corporation and Jacob N. Segura for Plaintiffs, Respondents, and Appellants 3405/3407 Slauson Avenue, LLC, David Ben Eliyahu, and Abraham Ben Eliyahu.

Robert A. Koenig, in pro. per.; Hess, Hess & Herrera, Alejandro H. Herrera, for Defendant and Respondent Robert A. Koenig.

Plaintiffs 3405/3407 Slauson Avenue, LLC, David Eliyahu, and Abraham Eliyahu (collectively, Slauson) filed an action for legal malpractice and breach of fiduciary duty against named defendants David Alessi (Alessi), Robert Koenig (Koenig), Thomas Bayard (Bayard), and Alessi, Koenig & Bayard, also known as Alessi & Bayard and Alessi & Koenig. Slauson served defendants Alessi and Koenig by substituted service pursuant to Code of Civil Procedure section 415.20[1] and obtained a default judgment. Alessi and Koenig eventually moved to set aside the judgment, arguing that substituted service was improper and that they should be granted relief under sections 473 and 473.5 in any event. The trial court denied the motion as to Alessi and granted it as to Koenig, and both parties aggrieved by the trial court's ruling appeal. We consider whether service was proper, whether Alessi lacked actual notice of the malpractice action such that the default judgment should be set aside, and whether the default judgment is attributable to attorney fault or instead to Alessi's inexcusable neglect. We also resolve Alessi's substantive challenges to the default judgment, which awards nearly $1 million in damages.

## I. BACKGROUND

In 2011, the year Slauson filed its malpractice suit against Alessi, Koenig, and Bayard, each man was a member of the California State Bar and, as we will explain, all three men professionally associated with one another under the auspices of different legal entities. Bayard worked out of an office in Diamond Bar, California (the Diamond Bar Office), and listed that address for official California State Bar purposes. Alessi and Koenig listed the same address with the California State Bar: Unit F4 in the Whizin Market Square shopping center in Agoura Hills, California (the Agoura Hills Office). As

[1] Undesignated statutory references that follow are to the Code of Civil Procedure.

2

a matter of fact, it was only Koenig that ever regularly worked out of the Agoura Hills Office, and from late December 2010 to early 2013, even Koenig vacated the Agoura Hills Office and worked from home while renovations were underway. Alessi, who had lived in Nevada since 2001, worked out of an office on Flamingo Road in Las Vegas (the Las Vegas Office).

The failure of Koenig and Alessi to maintain current address information with the State Bar complicated service of the summons and complaint in this action, which was effected by substituted service at the Diamond Bar Office. In the trial court (and now on appeal) Alessi and Koenig contended service of process in that manner was invalid. They also asserted they did not receive actual notice of the malpractice complaint or the proceedings because of misconduct by Bayard, namely, his failure to inform them of Slauson's malpractice lawsuit and the ensuing proceedings that led to the court's entry of a default judgment against them. The trial court held an evidentiary hearing over the course of 10 days in January and February 2014, hearing from 12 witnesses and receiving over 100 exhibits, on the issues of whether service was proper and, if so, whether the default judgment should be set aside under sections 473 and 473.5. The factual and procedural summary that follows is drawn primarily from the evidence taken by the trial court during the evidentiary hearing, evidence that served as the foundation for its extensive factual findings, both express and implied.

### A.    The Parties and Their Law Firms

Alessi and Bayard attended law school together and became best friends. As Alessi testified, the two thereafter grew even closer and became more like brothers. There came a point in time when Bayard asked Alessi if he could use Alessi's name in forming a law practice "Alessi & Bayard" in Diamond Bar for "infrastructure reasons" and so the firm name would carry greater weight than it would if he practiced as a sole practitioner. Alessi readily agreed.

3

In early 2010, Bayard entered into a lease for the Diamond Bar Office that was taken in the name of "Alessi & Bayard," and executed by Bayard. At all relevant times, the name on the door of the Diamond Bar Office stated that it was occupied by the firm of "Alessi & Bayard." The building landlord received rent checks for the Diamond Bar Office from "Alessi & Bayard, a Professional Corp."[2] Tax returns were filed on behalf of an entity known as "Alessi & Bayard."

Alessi admitted to being a partner in Alessi & Bayard, including in a sworn declaration filed in another matter. Alessi claimed, however, he received no income from that firm, and the undisputed evidence before the trial court was that he did not receive mail or phone calls there, and that he travelled to the office on only one occasion for personal, not professional, reasons. Koenig never visited the Diamond Bar office and his name was not used anywhere on the premises.

At the time Alessi & Bayard was getting off the ground, Alessi and Koenig had already established an assessment collection law firm, Alessi & Koenig, which was registered as a limited liability company in Nevada. Alessi authorized Bayard to practice in Diamond Bar under the Alessi & Koenig firm name. The Alessi & Koenig website available to the public in the first half of 2011 (www.alessikoenig.com) advertised Alessi & Koenig as a "multi-jurisdictional law firm," with offices in Las Vegas and other locations in Diamond Bar, Agoura Hills, and Reno, Nevada. The website also included pictures and short biographies of Alessi, Koenig, and Bayard as members of the firm. Later in 2011 or early 2012, the Alessi & Koenig website was updated to reflect that

---

[2]     Rent for the Diamond Bar Office was also paid on certain occasions by checks in the name of Alessi & Koenig. The memo line on some of the drafts include various references to the Diamond Bar Office, including "Diamond Bar Office rent" and "California Office Rent April 2012—Alessi & Bayard." During the evidentiary hearing, Alessi and Koenig could not explain why checks in the name Alessi & Koenig had been used, but they maintained they were not responsible for paying rent on the Diamond Bar Office.

4

Alessi was the "managing partner" of the firm, Koenig and Bayard were additional partners, and Ryan Kerbow (Kerbow) was an associate of the firm.[3]

B.    *The Underlying Representation and the Complaint for Malpractice*

In May 2009, Slauson entered into an attorney fee agreement with "Alessi & Bayard" for legal representation in connection with a real property dispute. Slauson believed it had been defrauded by the seller of the property, causing Slauson to pay approximately 40 percent more than the property was actually worth. The retainer agreement was signed by Bayard on behalf of Alessi & Bayard, and Slauson made out its retainer check to "Alessi & Bayard."

According to Slauson's complaint for professional negligence and breach of fiduciary duty, filed in March 2011 (the malpractice complaint), Bayard and another named defendant not a party to this appeal advised Slauson to stop making monthly payments on the secured loan obtained from the seller to purchase the property because, in their opinion, it would increase the seller's willingness to modify the terms of the loan. When the seller responded by instituting foreclosure proceedings, Bayard told Slauson he would seek an injunction to prevent the seller from proceeding with the foreclosure sale. No such injunction was ever sought, however, and Slauson lost its property through foreclosure in January 2010.

The malpractice complaint alleged that Alessi and Koenig were responsible for Bayard's actions as partners, members, and agents of a law firm known as "Alessi, Koenig & Bayard," also known as "Alessi & Koenig" and "Alessi & Bayard";[4] the complaint also included standard language alleging each of the defendants was the agent

---

[3]    Neither firm name, Alessi & Bayard or Alessi & Koenig, was registered with the California State Bar.

[4]    According to both Koenig and Alessi, there has never been an entity known as "Alessi, Koenig & Bayard."

5

of the other. Although the complaint's prayer for relief sought damages only as according to proof, the body of complaint calculated damages of "more than $1,000,000."

### C. Service of the Malpractice Complaint

On March 25, 2011, process server Jeffrey Mayer attempted to serve both Alessi and Koenig at the address they had on file with the State Bar: the Agoura Hills Office. According to Mayer's declaration of non-service, the address was "vacant property," and "per neighbor no forwarding address given." He testified that when he traveled to the office and looked in the window it was empty and he saw no furniture. When asked whether he had done any of his own independent research to try and locate Alessi or Koenig for service, such as an internet search, he explained he had not because the process serving company he worked for had a policy against it.

The Agoura Hills Office was vacant because Koenig had moved out in late December 2010 while the shopping center was being renovated. He worked out of his home until the latter half of 2013, when he returned to the Agoura Hills Office. Koenig's paralegal testified there was still some furniture in the office while it was vacant, but Koenig conceded that a person looking into the office from the outside at that time would have thought, "Well, it doesn't look like someone's been here that much." Although the office was closed, Koenig or his paralegal testified they frequently traveled to the office to collect mail that continued to be delivered to that address, and both claimed that a sign with Koenig's name and a phone number (that would reach him while he was working at home) could be seen in the office window.

On March 28, 2011, three days after the attempt to serve Alessi and Koenig, a process server personally served Bayard with the malpractice complaint and summons, both in his individual capacity and as registered agent for the named law firm defendant, at the Diamond Bar Office. Sometime thereafter, Slauson discovered the Alessi & Koenig website that identified Alessi, Koenig, and Bayard as members of a multi-jurisdictional law firm with offices in Diamond Bar. During the evidentiary hearing,

6

Slauson also admitted into evidence advertising listings on www.findlaw.com that identified the three men as engaged in the joint practice of law in Diamond Bar (as well as Agoura Hills and Las Vegas). Slauson argued it used these internet search results, along with its knowledge that Bayard had been personally served at the Diamond Bar Office, to instruct process servers to attempt service on Alessi and Koenig in Diamond Bar.

Process server Liliana Mejia (Mejia) first attempted to personally serve Alessi and Koenig at the Diamond Bar Office on June 22, 2011. She spoke with Kaley Kolb (Kolb), a paralegal in the office, who told her that both men were not available "at this time" because they were in Las Vegas and only Bayard was there. Mejia again attempted personal service the following morning without success. Mejia's notes reflect that Kolb told her both "subjects still associated with firm" but they were "not available at this time." Mejia returned to the Diamond Bar Office later that same day in the afternoon, and Kolb again told her Alessi and Koenig were not available "at that time." After the third failed attempt at personal service, Mejia returned the following day, June 24, 2011, and served Alessi and Koenig via substituted service by leaving a copy of the complaint and summons with Eva Ebert, a receptionist in the Diamond Bar Office. Mejia testified she would not have continued efforts to serve Alessi at the Diamond Bar Office if her interactions with Kolb left her feeling he was not working out of that office or that it was not his usual place of business.

After receiving the service copy of the malpractice complaint from Meija, Eva Ebert put the documents she received on Bayard's desk. Bayard found them where she left them. Despite receiving the substituted service copy of the malpractice complaint, Bayard did not then inform Alessi or Koenig about the suit Slauson had filed against them. Instead, as the trial court found, he personally told them about the lawsuit only much later in October 2013—due, in part, to a series of unfortunate events.

### D.    Bayard's Health Problems and State Bar Disciplinary Sanctions, and Alessi's Awareness of the Same

At the time Slauson served Bayard with copies of the malpractice complaint, Bayard had already been diagnosed with heart problems and he was struggling to keep up with his workload. When he reviewed a copy of the complaint, he thought it was obvious it was barred by the applicable statute of limitations, and he also planned "at some point" to contest the validity of service of process. A co-defendant named in the complaint filed for bankruptcy and told Bayard all trial court proceedings in the case had been stayed until resolution of the bankruptcy proceedings. Bayard therefore made a conscious decision at the time not to inform Alessi and Koenig about the existence of the malpractice complaint.

In August 2011, as Alessi was then aware, Bayard suffered a heart attack. He was treated in a hospital cardiac intensive care unit for several days, and had to undergo additional therapy after he was released. From the time of his heart attack through the end of 2011, the malpractice complaint slipped off his radar and he paid no attention to it.

Then, from January 11, 2012, to March 12, 2012, Bayard served a suspension from the practice of law imposed by the California State Bar as part of a stipulated resolution of complaints by seven of his clients.[5] Bayard told Alessi he had been suspended sometime around when the suspension happened.

Alessi was asked during the evidentiary hearing to describe any actions he took, as a partner of Alessi & Bayard, to make sure the clients of the firm were appropriately handled during the time Bayard had been suspended. Alessi testified that Bayard's work was reallocated to attorneys that had not been suspended, explaining: "[W]e discussed it as a firm. We have to protect [Bayard's] life. We have to protect the firm." When asked to explain what he meant by "protect the firm," Alessi elaborated: "Well, he's been suspended. He can't practice, so we've gotta account for that. So, we got Ryan Kerbow,

---

[5]    The State Bar again suspended Bayard for another 60-day period later in 2012. Alessi was also aware of that suspension.

who's a California attorney and a Nevada attorney, to step into whatever—a lot of what [Bayard] does, as well, is not—I mean . . . our California caseload is so small, we have three—four, licensed California attorneys, that it wouldn't have been much. It's not like he was litigating Hewlett Packard versus the United States of America. We didn't have a lot on our table. So, Ryan taking over for him wasn't anything that required, you know, too much discussion."

In May 2012, Bayard had a second severe heart attack while playing basketball at Alessi's home in Las Vegas. After hospitalization, and once he was again able to think and function, Bayard prepared a spreadsheet listing his pending matters and gave it to Kerbow because Bayard was worried he might die. Slauson's malpractice lawsuit (i.e., this action) was one of the cases on the spreadsheet, and Bayard made a notation next to it indicating service was improper, the matter was stayed, and no action was necessary at that time. Bayard testified that, to his knowledge, Kerbow did nothing with respect to the malpractice case after receiving the list from Bayard.[6]

### E. The Entry of Defaults and Bayard's Unsuccessful Efforts to Have the Defaults Set Aside

In February 2013, the trial court lifted the stay on proceedings it had imposed pending the conclusion of the related bankruptcy proceedings and issued an order to show cause regarding dismissal of defendants Alessi and Koenig due to Slauson's failure to have taken their default. In response, Slauson filed requests for entry of default against Koenig and Alessi on February 7, 2013, and served copies of the requests at the address of the Diamond Bar Office. The court clerk entered Alessi and Koenig's default that same day.

---

[6] During the trial court proceedings, Alessi and Koenig did not submit a declaration from Kerbow with their motion to set aside the default judgment. Neither side called Kerbow to testify as a witness during the evidentiary hearing.

The trial court subsequently set a hearing on an order to show cause regarding the entry of a default judgment for May 7, 2013. Bayard contacted an appearance attorney to attend the hearing. (At the time of the evidentiary hearing, Bayard could not be certain why he did not come to court himself, but he speculated he might have been working out of the Las Vegas office of Alessi & Koenig at the time.) Bayard intended that the appearance attorney would not enter formal appearances for Alessi or Koenig, but instead would alert the court that there were issues regarding service of process that defendants planned to raise in seeking to set aside the defaults.

After the hearing, the appearance attorney reported that he had advised the court that the defaulted parties would be moving to quash the malpractice complaint summons and to set aside the defaults. The attorney further advised that the court had set July 19, 2013, as the date it would hear the motions and that the movants should submit supporting declarations and have their witnesses available on the hearing date because the court would likely hold an evidentiary hearing.

Bayard delayed in preparing a motion to set aside the defaults because he believed counsel for Slauson was willing to stipulate to set them aside in exchange for his agreement to answer the malpractice complaint. No such stipulation was reached, however, and Bayard did not meet the deadline for getting a motion on file. When the time for the hearing came, Bayard again sent an appearance attorney to tell the court that there had been a misunderstanding about a stipulation to set aside the defaults and to seek a continuance of the hearing. That is what the appearance attorney did, and trial court denied the request for a continuance, finding that defendants had not filed a timely motion for relief and that the failure of defendants to appear personally at the hearing as ordered was outrageous, bad-faith conduct. The trial court instructed Slauson to proceed with seeking a default judgment and set the matter for a "prove-up" hearing on September 16, 2013.

10

Bayard did not tell Alessi or Koenig about the July hearing or the court's ruling because he didn't have a plan of action, he felt guilty about what had already transpired, and because he was occupied by his still-ongoing health problems.

### F. The Default Judgment, and Efforts to Have it Set Aside

At the default prove-up hearing, based on Slauson's declarations regarding damages and an expert declaration that defendants were negligent, the trial court found defendants committed professional malpractice and breached their fiduciary duty to Slauson. The court entered default judgment on the date of the hearing, September 16, 2013, in the amount of $996,091.92, consisting of damages of $800,392.57 plus $195,699.35 in prejudgment interest.

Bayard learned the trial court had entered a default judgment on September 30 or October 1. He quickly drafted a motion to set aside the defaults and default judgment against Alessi and Koenig, arguing attorney fault (section 473, subdivision (b)) and lack of actual notice (section 473.5), which was filed on October 2, 2013. In connection with the motion, Bayard filed declarations purportedly from Alessi and Koenig that they neither reviewed nor authorized. He claimed he did so because he "wasn't thinking clearly," and because he believed neither man would have an objection to him filing the declarations, which he believed were accurate.

In the meantime, Bayard traveled to Las Vegas and told Alessi and Koenig, with Koenig joining the conversation by phone, all that had transpired concerning the existence of the malpractice lawsuit and the default judgment the trial court had entered. The conversation occurred on October 3, 2013, and both Alessi and Koenig testified that this was the first time they were aware of what had transpired in this case, including the default judgment. Both men were surprised and very upset. Bayard told Alessi and Koenig that he was going to "fix the situation." Bayard explained he had already filed a motion to set aside the default judgment and he intended to file as soon as possible an ex parte application to stay enforcement of the judgment pending resolution of the motion to

11

set it aside. Alessi and Koenig acquiesced in Bayard's plan in the sense that they did not object.

On October 7, 2013, Bayard filed the ex parte application to stay enforcement of the judgment, accompanied by another motion to set aside the defaults and default judgment. The application and motion sought relief based upon Bayard's failure to inform Alessi and Koenig of the litigation and to take proper steps to prevent the entry of a default judgment against them. Bayard attributed his actions to his health problems, as well as his belief the action had not been properly served and was barred by the statute of limitations. Bayard again signed and submitted declarations on behalf of Alessi and Koenig without either man having reviewed their contents. The trial court denied the ex parte application the same day it was filed.

After the trial court denied Bayard's October 7 ex parte application, Alessi and Koenig—represented by new counsel they had since retained—filed another motion on November 20, 2013, to set aside the default. That motion, which resulted in the evidentiary hearing and trial court ruling now before us on appeal, argued Alessi and Koenig had not been properly served, did not have actual notice of the malpractice complaint, and were entitled to relief from the default judgment because its entry was attributable to Bayard's fault, including his failure to earlier advise them of the action.

In opposition, Slauson argued that substituted service was proper at Bayard's Diamond Bar office because both Alessi and Koenig had an office there; Alessi and Koenig's inexcusable neglect barred setting aside the default judgment; and the three attorneys operated as a law partnership and Bayard's negligence was imputed to Alessi and Koenig.

### G.     The Trial Court's Ruling

The trial court issued a ruling on the pending motions to set aside the defaults and default judgment on March 25, 2014. The court concluded that the October 2 and October 7 motions for relief from the defaults and default judgment were sham

12

documents because they were based on evidence in declarations that the actual declarants had not signed. The court accordingly struck both motions in their entirety. As to the November 20, 2013, motion that was the subject of the evidentiary hearing the court conducted, the trial court denied the motion as to Alessi but granted it as to Koenig. The March 25 order attached a transcript of the court's ruling from the bench at the conclusion of the evidentiary hearing as its statement of decision.

At the outset of its oral ruling, the trial judge explained that "as an approach, I look for many, many ways to find people not in default. I liberally . . . grant relief from default. But on a couple of occasions, this being one of them, I just don't think that justice would be served by granting [Alessi] the relief sought by the defense." The trial court went on to address in detail (1) whether substituted service on Alessi and Koenig was proper and, if so, (2) whether either man had made a sufficient showing to have the default judgment set aside—viewing many of the key facts as relevant to both issues.

Regarding service of process, the court accepted Alessi and Koenig's representations that they did not have actual notice of the lawsuit before the defaults were entered, and found that October 3, 2013, was the date they actually learned of the action. The court also accepted their testimony that they were not actively involved in the Diamond Bar Office because it believed there had been no evidence to the contrary.

However, with respect to Alessi, the court found that it was "as clear a case of substituted service as I have ever seen or read about." The court found that from the standpoint of what the public knew about the parties and their law firm, any rational person would assume that defendants could be reached at any of the three office locations. The court further found that the client in the case, Slauson, had signed a letter of engagement with Alessi & Bayard, and that the Diamond Bar Office was the address of the law firm they hired, so "it is only rational, at least [for] Mr. Alessi, if you're going to contact Mr. Alessi, that you go to a place that has his name on the door . . . ." The court also emphasized it was not just the fact that Alessi's name was on the door, but also the firm letterhead and the website advertising that indicated Alessi, Koenig, and Bayard

13

were engaged in practice together as part of a "multi-jurisdictional law firm." The court concluded: "So I can see that they create a world where this is where people go to serve them. And at least on prior occasions, this is a [location] where they have been notified of lawsuits and defended. And this is a world [] destined to fail. Something is destined to fall through the cracks, and it's destined to fall through the cracks because of their own actions . . . . [¶] . . . [¶] So as to Mr. Alessi . . . I don't think this is even remotely close. If I were to—if I were [counsel for Slauson] and I were wanting to sue that law firm, I would go through the correspondence file, find out the correspondence. I'd find out where the address was and who was involved and I would go over to that address and serve them. It's irrational to do anything else, especially when the process server went out there—and I'll find this as a fact also—wasn't told they're never there. [¶] I mean . . . they were told they're in Las Vegas. They're not here at this time. There's no reason to believe that they're in Las Vegas forever. [¶] So they had every—every reason to drop off for Mr. Alessi—at least with Mr. Alessi because his name is on the door, that's where he was served. [¶] Mr. Koenig, it's a very, very close issue. I think either decision, saying that he was served or wasn't served, validly would be a rational, reasonable decision. . . . But because it's pretty much a tie, tie goes to the runner, and he's the runner. [¶] And I don't think he was validly substitute served."

On the question of whether Alessi and Koenig were entitled to relief from default, the court found that their lack of notice of the proceedings was attributable to their own inexcusable neglect.[7] Although Alessi and Koenig did not actively practice out of the Diamond Bar office, the court concluded they held themselves out as being involved with that office and they should have more carefully monitored what came into the office. The court explained at greater length: "Apparently [the summons and complaint] went to a partner of theirs [Bayard], who acted as their attorney in fact in other cases . . . and he

---

[7]    Although it need not have reached this issue as to Koenig due to its finding that service on him was not proper, the court addressed its ruling on inexcusable neglect to both Alessi and Koenig.

14

made breathtakingly atrocious legal decisions and tactical decisions[, assuming] the statute [of limitations] was blown, that service was bad and [Bayard] just let this thing fall through the cracks. . . . [¶] Mr. Bayard had State Bar issues. You know, it's—you talk about a red flag. Granted it was after service had been made. But still, you know, if you have set up a universe where you represent this is where your office is, you have no contact with this office and later on the one contact you have there has State Bar issues, you—that called for an audit, calls for someone to come down and seriously go through it. [¶] You don't need to have affirmative information there's a problem in a given case. You know there's a problem, if for no other reason, he had health issues. . . . And again, more reason[] to come down and do some serious review of the work that has been done in that Diamond Bar Office. And I applaud them for sending Mr. Kerbow down, but that is the very least that could be done. [¶] . . . [¶] You know, I was perfectly willing, had the [defendants] come to court in May or July, to give them the benefit of the doubt. . . . [¶] Still there was nothing. . . . [¶] Had you changed anything, where you created a universe where you represented that this was where you could be reached and you occasionally went there and visited and saw what was going on and reviewed the case, that would have caught this. But they have no one to blame but themselves if they didn't have [actual] notice. . . . [¶] . . . [¶] So, for all of those reasons, I think there was substituted service for Mr. Alessi. A very close call for Mr. Koenig, but I will give him the benefit of the doubt. [¶] But as to any attempt to get relief on attorney fault or excusable neglect, no way. This is a tsunami of evidence. And I haven't seen any case in law, and I haven't seen, frankly, in my practice for the last 42 years, nor have colleagues I have spoken to about that, ever heard of this in their practice."

## II. DISCUSSION

The appeal and cross-appeal require us to consider whether service was proper on Alessi and Koenig, and if so, whether they were entitled to relief from default. We conclude that service was proper on Alessi at the Diamond Bar Office because the

15

process servers exercised reasonable diligence in attempting personal service, and because Alessi & Bayard was Alessi's own business enterprise, and thus, his "usual place of business" for purposes of substituted service. As to Koenig, however, we affirm the trial court's decision to find substituted service was improper; we see no adequate basis to reverse the court's finding the Diamond Bar Office was not Koenig's "usual place of business" and Koenig did not make a general appearance or otherwise take action that would waive defects in the service of process. We further hold that the trial court did not abuse its discretion in denying Alessi relief from default under sections 473 and 473.5, based on its finding that the default judgment was attributable to Alessi's own inexcusable neglect in failing to sufficiently monitor what transpired in Alessi & Bayard's offices in Diamond Bar. Last, we reject Alessi's additional, somewhat perfunctory arguments for reversal: that Slauson should have filed a statement of damages, that the damages the trial court awarded in the judgment were grossly excessive and pled in uncertain terms, that the complaint did not state valid causes of action, and that the request for entry of default was improperly served.

### A. Pending Motions

Before we reach the merits of the parties' contentions, we address motions on appeal that were deferred for our consideration, including a motion to dismiss Alessi's appeal based on his failure to provide required citations to the record in his opening brief, and a motion to strike portions of his cross-respondent's brief for the same reason. (Cal. Rules of Court, rule 8.204(a)(1)(C).)

Koenig, who initially served as counsel for Alessi in this appeal,[8] conceded his opening brief failed to include all of the required citations to the record. He opposed

---

[8]     After briefing was complete, both Alessi and Koenig filed attorney substitutions designating Alejandro Herrera as their attorney of record. Mr. Herrera ably represented both men at oral argument and our discussion in this part of the opinion concerning the performance of counsel is confined to actions taken by Koenig during the period he served as counsel for Alessi.

16

dismissal of the appeal on the ground that the error was inadvertent and resulted from the filing of the wrong "final" version of the brief. With his opposition to Slauson's motion to dismiss, Koenig submitted a declaration signed under penalty of perjury that averred: "Appellant is filing the correct version of the brief which has not been substantively modified in any way. The only change from the previously filed brief is the factual citations." Koenig reiterated these points, i.e., that the brief had not been substantively modified in any way and that the only changes were factual citations, in the text of the memorandum of points and authorities accompanying his opposition and in his reply brief filed on November 17, 2015. Regrettably, the purportedly "corrected" brief submitted by Koenig is doubly deficient.

First, and contrary to his representations, the "corrected" brief was not limited to the addition of record citations; it instead made marked changes that are substantive. Counsel for Slauson highlighted substantive differences between the two documents in a supplemental motion to dismiss the appeal filed on February 25, 2016. Neither Koenig nor Mr. Herrera, as counsel for Koenig (and Alessi), filed a response to Slauson's supplemental motion in order to explain why the "corrected" brief contained substantive alterations notwithstanding Koenig's representations to the contrary. At oral argument, this Court invited Mr. Herrera to address the issue or offer an explanation—he respectfully declined.

Second, the purportedly "corrected" brief submitted by Koenig still suffered from the absence of sufficient record citations. Just a partial sampling of the factual assertions in that brief (and in his reply brief) for which there continued to be no citation to the record includes the following, many of which concern key points that bear on the resolution of this appeal:

- "Neither Alessi nor Koenig were aware of Bayard's representation of Slauson in the [underlying] matter. Koenig has never been to Bayard's Diamond Bar office, while Alessi has been . . . there once—to pick up Bayard to go to a Laker's game. Neither Alessi nor Koenig had an office at the Diamond Bar location, neither

17

received mail or telephone calls there, nor did they manage or direct the operation there. Alessi and Koenig did not share in any of Bayard's income from his Diamond Bar practice in 2011." ("Corrected" Opening Brief, page 19.)

- "Koenig's name was nowhere listed at the Diamond Bar office location. The name 'David A. Alessi' was nowhere listed at the Diamond Bar office location." ("Corrected" Opening Brief, page 21.)

- "In August 2011 Bayard suffered a massive heart attack. His recovery impacted his law practice, and several matters, including the Slauson case, did not receive any attention." ("Corrected" Opening Brief, page 22.)

- "However, during his testimony at the evidentiary hearing, [process server] Meyer [*sic*] contradicted the statements in his affidavit, testifying that the office signs [at the Agoura Hills Office] were still up and that the office itself was still furnished with the furniture covered with sheets." (Reply Brief, pages 27-28.)

- "When [process server] Mejia went to the Diamond Bar office to attempt service, she was clearly told that neither [Alessi or Koenig] worked out of that office and that they would both have to be served in the Las Vegas office." ("Corrected" Opening Brief, page 35.)

The last two of these factual assertions illustrate the importance of citing to the record, and the writing discipline that often falters when citations are missing. Contrary to Alessi's assertion, we have found no place in the record where process server Mayer stated the Agoura Hills Office was still furnished when he peered in the window. Rather, when asked, he testified he saw no furniture. Likewise, Mejia did not testify she was told Alessi and Koenig would "have to be served in the Las Vegas office," and Kolb did not so testify either.[9] Indeed, Mejia testified she would not have continued to attempt service

---

[9] Kolb testified that she said Alessi was not in "at this time" and was in the Las Vegas office during Mejia's first visit to the Diamond Bar Office. When asked *why* she said that, Kolb explained she said Alessi was in Las Vegas because that's where he would have to be served. But Kolb did not testify she told Mejia that.

if she had been told that the Diamond Bar Office was not their usual place of business, and, as the trial court found, she was told only that they were not available "at this time."

Koenig's failure to include sufficient record citations has hindered the work of this Court. "It is counsel's duty to point out portions of the record that support the position taken on appeal. The appellate court is not required to search the record on its own seeking error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.) Nevertheless, we exercise our discretion to consider the appeal and the cross-respondent's brief under the circumstances presented here.[10] (*Ibid.* [exercising discretion to consider the plaintiff's position despite an opening brief that contained "no citations to the record whatsoever"].) Accordingly, we deny Alessi's request to file a corrected brief and we decide the matter based on the initial opening brief filed on his behalf, disregarding the non-compliance. (Cal. Rules of Court, rule 8.204(e).)

Notwithstanding our decision to consider rather than dismiss the appeal, we are concerned by the representations Koenig made to this Court regarding the changes made to the "corrected" brief. Under Business and Professions Code section 6068, an attorney admitted to practice in California has a duty "[t]o employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).) Because it is probable Koenig has violated this duty here, we will direct the clerk of this Court to forward to the State Bar of California a copy of this opinion, along with copies of the opening brief filed by Koenig and the document he filed on November 5, 2015, entitled "Appellant David A. Alessi's Opposition to Motion to Dismiss Appeal; Memorandum of Points and Authorities; Declaration of Robert A. Koenig, Esq. in Support." (See *Mammoth Mountain Ski Area v. Graham* (2006) 135 Cal.App.4th 1367, 1375.)

---

[10]     We also decline to impose monetary sanctions.

19

Slauson also seeks dismissal for Koenig's acknowledged citation to an unpublished decision in his opening brief. Citation to unpublished opinions is prohibited except in very narrow circumstances, and we admonish Koenig that a citation for "illustrative purposes," his explanation for the citation, is certainly not one of them. (Cal. Rules of Court, rule 8.1115.) Had the citation and associated discussion been more extensive, we would have concluded sanctions were appropriate. However, we trust our admonishment here is all that is necessary to deter any similar future violations. (Cf. *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 884-886 [sanctions imposed to deter future similar violations where reliance on unpublished decision was extensive, including eight citations and discussion over four pages in a reply brief after being alerted to the improper citation].)

Slauson also contends Alessi's appeal is moot and should be dismissed because he failed to seek appellate review of the October 2 and 7, 2013, motions and he is therefore bound by the trial court's denial of those motions. We deny the request for dismissal. The trial court struck the October 2 and 7 motions in the same order in which it ruled on the superseding November 20, 2013, motion that sought identical relief. It is that motion that is properly before us on appeal.

Finally, shortly before oral argument, Koenig and Alessi filed a motion to strike all briefs filed on appeal by Slauson and to reopen briefing on the ground that 3405/3407 Slauson Avenue, LLC was a suspended or inactive corporation during the period between 2006 and December of 2015. Slauson filed an opposition to the motion contending 3405/3407 Slauson Avenue, LLC was revived and restored to good standing on January 8, 2016, and this retroactively validated all actions taken by Slauson during the period of suspension (citing *Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 950-951). We deny the motion to strike and to reopen briefing as inadequately supported by competent evidence.

20

B. *Substituted Service Was Proper Only as to Alessi, Not Koenig*

Section 415.20, which authorizes a party to serve a summons and complaint by substituted service, provides in relevant part: "If a copy of the summons and complaint cannot with reasonable diligence be personally delivered to the person to be served . . . a summons may be served by leaving a copy of the summons and complaint at the person's dwelling house, usual place of abode, usual place of business, or usual mailing address other than a United States Postal Service post office box, in the presence of a competent member of the household or a person apparently in charge of his or her office, place of business, or usual mailing address . . . who shall be informed of the contents thereof, and by thereafter mailing a copy of the summons and of the complaint by first-class mail, postage prepaid to the person to be served at the place where a copy of the summons and complaint were left." (§ 415.20, subd. (b).) Alessi contends that substituted service on him was improper because there is no proper record of service; because Slauson did not exercise reasonable diligence to effect personal service; and because the Diamond Bar Office, the location where the summons and complaint were left, was not Alessi's "usual place of business."

We resolve claims that an entry of default and default judgment are void for lack of proper service of process under the de novo standard of review. (*Giorgio v. Synergy Management Group, LLC* (2014) 231 Cal.App.4th 241, 247; *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1200.) Factual findings made by the trial court in determining whether service of process was valid, however, are reviewed for substantial evidence, meaning we disregard any conflict in the evidence and accept the trial court's findings so long as they are supported by evidence that is reasonable, credible, and of solid value. (*Stafford v. Mach* (1998) 64 Cal.App.4th 1174, 1182 [assessing whether substantial evidence in the record supports trial court's implicit finding that summons and complaint properly served by substituted service]; see also *Giorgio v. Synergy Management Group, LLC, supra*, at p. 247; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [when

two or more inferences can reasonably be deduced from facts, reviewing court without power to substitute its deductions for those of the trial court].)

### 1.    *There is a proper record of service*

Exhibit 3, a completed proof of service admitted into evidence during the evidentiary hearing, sets forth the three unsuccessful attempts made to serve Alessi personally at the Diamond Bar Office and substituted service that was completed on June 24, 2011.  A nearly identical proof of service as to Koenig was admitted into evidence as Exhibit 4.

Alessi nonetheless points to a July 5, 2011, minute order for a status hearing in this case to show there is no sufficient record that service was made.  There is no transcript of the status hearing included in the record.  The trial court's minute order states, in relevant part:  "Counsel reports on the status of the case as follows: Defendant Hackett is in bankruptcy.  Defendant Bayard as an individual is defaulted; Allessi [*sic*] and Koenig have not yet been served.  [¶]  Counsel is to consider service by publication if service have [*sic*] not been effectuated."  Alessi claims there was no proper service because the proof of service on June 24, 2011, (Exhibit 3) was followed by "a court order reflecting non-service."

The argument is meritless.  The court order does not determine service had not been validly made; it expressly states counsel should consider service by publication *if* service had not been effectuated.  More to the point, the trial court heard and rejected this argument by Alessi, making the factual finding that "there's no dispute that the plaintiff went to the Diamond Bar address and then served the people there.  So . . . the default was properly entered."  That finding is, of course, supported by the evidence, including Exhibit 3 and the hearing testimony by the process servers.

## 2. *Reasonably diligent efforts at personal service were made as to Alessi*

Based on the trial court's factual findings, which are supported by substantial evidence, we conclude reasonably diligent efforts were made to personally serve Alessi.

Service of a summons and complaint may be made by personal service or by delivery to a person at the defendant's usual residence or place of business. (§§ 415.10, 415.20.) Relevant here, if the complaint and summons cannot be personally served with reasonable diligence on an individual defendant, then service may be made by "substituted service," namely, delivering copies of the complaint and summons to someone other than the defendant and mailing an additional copy to the defendant. (§ 415.20, subd. (b).) A plaintiff bears the burden to establish that reasonable attempts to personally serve the individual defendant were made before resorting to substituted service, and each case must be judged on its own facts. (*Evartt v. Superior Court* (1979) 89 Cal.App.3d 795, 801.) "Two or three attempts to personally serve a defendant at a proper place ordinarily qualifies as '"reasonable diligence."'" (*American Express Centurion Bank v. Zara* (2011) 199 Cal.App.4th 383, 389.)

Slauson's process server first went to Alessi's address on file with the California State Bar—the Agoura Hills Office—to attempt personal service, but when the process server arrived, the office appeared vacant. The trial court found, based on the evidentiary hearing testimony, that reasonable diligence required no further efforts to personally serve Alessi and Koenig at that address: "[Slauson] finds an address in Agoura Hills, goes to that address and finds out the office for all intents and purposes is shut down, is told they've moved and there's no forwarding address. [¶] I don't think, under those facts, that there's any obligation to wander through the mall asking strangers if they know Mr. Koenig or where he might be. . . . [¶] It's reasonable, I guess, to go back [*sic*] to the Diamond Bar address. But I am concerned that the name Koenig never appears anywhere in the Diamond Bar address." The finding that the Agoura Hills Office appeared vacant is supported by substantial evidence, including Mayer's testimony, the declaration of non-

23

service he completed, and even aspects of the testimony of Koenig's paralegal and Koenig himself.  Under the circumstances, further attempts to complete service on Alessi at the Agoura Hills Office would have appeared futile and reasonable diligence required no further efforts to serve him at that location, which was the address he had on file with the State Bar.

Alessi counters, however, that requirements of section 415.20 went unsatisfied because the further efforts Slauson made to complete personal service at the Diamond Bar Office should not in his view count toward the exercise of reasonable diligence.  He cites *Espindola v. Nunez* (1988) 199 Cal.App.3d 1389, a case that upheld substituted service, and emphasizes the opinion's reference to service at a "proper place" when describing efforts that are normally sufficient to demonstrate reasonable diligence.  (*Id.* at p. 1392 ["'Ordinarily, . . . two or three attempts at personal service at a proper place should fully satisfy the requirement of reasonable diligence and allow substituted service to be made.' (Note, *Substituted Service of Process on Individuals: Code of Civil Procedure Section 415.20(b)*[ 1970] 21 Hastings L.J. [1257,] 1277)"].)

We agree with the general proposition Alessi advances, namely, that personal service must be attempted at a "proper place."  Had Slauson made further attempts at personal service on Alessi at some other location to which he had no ties, say the headquarters of Google, that would obviously be insufficient to demonstrate reasonable diligence.  (But see *Hearn v. Howard*, *supra*, 177 Cal.App.4th at p. 1202 [three attempts to serve attorney defendant at a private post office box store, which was her address on file with State Bar and on business letterhead, sufficient to constitute reasonable diligence].)  Attempting service at the Diamond Bar Office, however, was not the equivalent of attempt of attempting service at Google—far from it, on this record.

When service on Alessi was unsuccessful at the Agoura Hills Office, Slauson made the reasonable judgment to attempt service at the address of Alessi & Bayard, the law firm it retained to represent Slauson in the underlying real property dispute.  At the time of the attempted service on Alessi at the Diamond Bar Office in June 2011, Slauson

24

was aware that it had already effected valid personal service on Bayard at that office, and it was undisputed that Alessi's name, along with Bayard's name, appeared on the door of the office—just as it did on the attorney retainer agreement Slauson signed. Alessi complains that Slauson could have taken other steps that in hindsight might have been more likely to result in successful personal service on him, including calling the phone number on the State Bar website or running additional internet searches. That additional avenues for investigation were available and not pursued, however, does not establish that the Diamond Bar Office was not a proper place to make additional attempts at personal service.

Furthermore, once Slauson's process server began attempts to serve Alessi at the Diamond Bar Office, her interactions with the office staff provided no basis to believe that the location was not a proper place to attempt service. Indeed, quite the opposite, as the trial court expressly found. Process server Mejia was simply told Alessi was unavailable "at [that] time" (the same for Koenig), not that the Diamond Bar Office was an improper place to attempt personal service. Mejia's notes also indicated she was told "subjects still associated with firm," and Mejia testified that she would not have continued to attempt service on Alessi if she got the impression he was not working out of that office.

The record establishes Mejia made three attempts to personally serve Alessi at the Diamond Bar Office at three separate times on two different days. This is reasonable diligence that permitted proceeding by way of substituted service. (*American Express Centurion Bank v. Zara, supra,* 199 Cal.App.4th at p. 389.)

On the issue of reasonable diligence as to Koenig, on the other hand, the trial expressed doubt about whether it was proper to make additional efforts at personal service on him at the Diamond Bar address. Koenig's name was not on the retainer agreement with Slauson, and his name was not on the door of the Diamond Bar Office or otherwise displayed at the premises. Under the circumstances, we likewise have doubts about whether it was reasonably diligent to attempt service on Koenig at an office where

his name nowhere appeared rather than making further investigative efforts to determine whether the location was a proper place to attempt service.

On the other hand, Slauson did seek to establish the Diamond Bar Office was a proper place as to Koenig by pointing to the www.findlaw.com printouts with listings for an "Alessi, Koenig, and Bayard" firm in Newark, California, Las Vegas, Nevada, Agoura Hills, California, and Diamond Bar, California, as well as the www.alessikoenig.com website that in June 2011 listed Diamond Bar, California as one of the "other locations" where Alessi & Koenig had offices. There was also Mejia's testimony that Kolb, the paralegal in the Diamond Bar Office, told her that the "subjects" (plural) were still associated with the firm when Mejia was at the Diamond Bar Office attempting to effectuate service. In the end, however, we need not resolve whether the Diamond Bar Office was a proper place for purpose of making reasonably diligent efforts to personally serve Koenig because substituted service on him was improper at that location even if section 415.20's reasonable diligence requirement were satisfied; unlike Alessi, the Diamond Bar Office does not qualify as Koenig's "usual place of business" under section 415.20.

### 3. Substituted service was made at Alessi's, but not Koenig's, "own business enterprise"

Following reasonable diligent efforts at personal service, section 415.20 permits a party to make substituted service by leaving a copy of the summons and complaint at one of four specified locations including the person's "usual place of business" (§ 415.20, subd. (b).) The statute itself does not further define "usual place of business," but the associated Judicial Council commentary explains "[t]he term 'usual place of business' includes a defendant's customary place of employment *as well as his own business enterprise*." (Judicial Council of Cal., com. to section 415.20, subd. (b) (emphasis added).) The Judicial Council's comment is "highly persuasive evidence" of the Legislature's intent regarding the proper interpretation of subdivision (b). (*Pasadena*

26

*Medi-Center Associates v. Superior Court* (1973) 9 Cal.3d 773, 778; *Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1434-1435.)

"To be constitutionally sound[,] the form of substituted service must be 'reasonably calculated to give an interested party actual notice of the proceedings and an opportunity to be heard . . . [in order that] the traditional notions of fair play and substantial justice implicit in due process are satisfied.'" (*Zirbes v. Stratton* (1986) 187 Cal.App.3d 1407, 1417.) To achieve this result, "[i]t is crucial that a connection be shown between the address at which substituted service is effectuated and the party alleged to be served." (*Corcoran v. Arouh* (1994) 24 Cal.App.4th 310, 315 [service improper where no factual showing made to tie defendant to address where he was served].) Substituted service is proper where it is reasonably calculated to give an interested party actual notice by making service "upon a person whose 'relationship with the person to be served makes it more likely than not that they will deliver process to the named party.'" (*Bein v. Brechtel-Jochim Group, Inc*. (1992) 6 Cal.App.4th 1387, 1393.)

### a. *Alessi*

As counsel for Alessi conceded at oral argument, the Alessi & Bayard firm was Alessi's "own business enterprise." Substituted service on Alessi at the Diamond Bar Office was therefore proper because Alessi & Bayard was Alessi's "usual place of business" for purposes of section 415.20.

During his evidentiary hearing testimony, Alessi admitted he was a partner in the firm of Alessi & Bayard and that he had given Bayard express permission to use his (Alessi's) name in forming the firm. Bayard likewise admitted that the sole shareholders in Alessi & Bayard were himself and Alessi. Alessi testified he didn't "make any money out of the Diamond Bar office," and there was no evidence to the contrary, but Alessi did derive a benefit from the existence of that office. As Alessi conceded, the website and letterhead for Alessi & Koenig, from which he certainly did make money, described the firm as a multi-jurisdictional firm with offices in multiple locations, including Diamond

27

Bar. This sort of advertising, representing to the general public that the Alessi & Koenig firm operated in various jurisdictions, made the firm appear more prestigious; Alessi also testified that it gave the firm greater latitude to operate under Nevada law.

By all outward appearances, too, Alessi & Bayard was Alessi's business enterprise, jointly with Bayard. As we have detailed, Alessi's name was on the door of the Diamond Bar Office and his name, as part of the firm name, was also on the retainer agreement signed by Slauson and the lease agreement for the Diamond Bar Office premises. Additionally, when the process server went to attempt personal service at the Diamond Bar Office, her notes reflect she was told Alessi was still associated with the firm.

Because Alessi & Bayard was Alessi's own business enterprise, Alessi was subject to service at the firm's office. We are not confronted with a situation of substituted service at a corporation with a diffuse ownership structure or a large number of employees. Rather, the only shareholders in Alessi & Bayard (assuming shares were issued) were Alessi and Bayard. On the facts presented here, Slauson had ample reason to believe service of the summons and complaint at the offices of *Alessi* & Bayard would result more likely than not in delivery of the documents to Alessi, and Alessi has no basis to complain that that a decision to leave documents at his business enterprise would be unlikely to result in notice of the action. (*Bein v. Brechtel-Jochim Group, Inc.*, *supra*, 6 Cal.App.4th at p. 1393; cf. *Corcoran v. Arouh*, *supra,* 24 Cal.App.4th at p. 315 [substituted service invalid where "no indication in the record to tie in [the defendant] to the address where he was allegedly served"].)[11] That Alessi did not in fact receive actual

_____

[11] In *Zirbes v. Stratton, supra*, 187 Cal.App.3d 1407, the Court of Appeal held that substituted service on the defendant's estranged husband at a restaurant where she had not been employed for years was invalid. (*Id.* at p. 1417.) The court explained the defendant still retained a "community interest" in the restaurant, but that interest did not make for a strong enough connection for effective service under the circumstances. (*Ibid.*) The facts at issue in *Zirbes* are not analogous to the facts here. Alessi's interest in Alessi & Bayard was stronger than a mere undefined "community interest," and the connection between Alessi and Bayard, who were "like brothers" was far from the "estranged husband" relationship at issue in *Zirbes*.

notice at the time of service is not a question of whether the Diamond Bar Office was a proper location for substituted service but of whether relief from the default judgment should be granted—a question we shall soon address.

Alessi objects, however, that mere ownership of a business enterprise is not enough. He cites a student note in a law review article that opines "it is desirable to require at least that the defendant be actively interested in the management or operation of the business before the business will qualify as a place where summons may properly be served." (Note, *Substituted Service of Process on Individuals: Code of Civil Procedure Section 415.20(b)* 1970 21 Hastings L.J. 1257, 1270.) He also points to the finding of the trial judge, believing there was no evidence to the contrary, that he would accept Alessi and Koenig's testimony "that they were not actively involved in the Diamond Bar [O]ffice."

We do not agree active involvement in the management or operation *of one's own business enterprise*—at least one of the size and scale of Alessi & Bayard—is necessary to complete valid substituted service at that enterprise. Requiring a party making substituted service to know the manner and degree of control in fact exercised by business owners would impose a significant and undue burden. The party making substitute service will have already made reasonably diligent efforts at personal service (a prerequisite for substituted service), and the serving party may in many instances be unaware of the day-to-day inner workings of the business where substituted service takes place. This is particularly true because service of process usually occurs at the commencement of litigation, before the serving party has had an opportunity to discover facts about the party to be served. Plus, where a party is substitute-served at his or her own business enterprise, there is no danger that the person who accepts service will lack sufficient knowledge about the party served or lack a sufficient relationship to that party to make it probable the documents will be delivered. All employees at a company know who the woman or man at the top is, and no employee wants to be the one to fail to tell the boss about the receipt of important legal documents. Section 415.20's requirement

29

that the substituted service copy of the complaint and summons be left with the person "apparently in charge" reinforces this point. Even at a business enterprise that operates out of more than one location, the obligation to deliver the complaint only to the person who is apparently charge of the location visited by the process server guards against the possibility that the complaint will be left with a low-level employee who will not understand its import or the need to ensure it reaches the intended recipient.[12]

Even if we were to agree, however, that it is not just "desireable" but necessary for there to be facts indicating Alessi had been actively involved in the management or operation of Alessi & Bayard, there are such facts in the record. We do not take issue with the finding made by the able trial judge in this case that, as a day-to-day matter, Alessi was not actively involved in managing the Alessi & Bayard firm—indeed, as we will explain, that is precisely the reason he is not entitled to set aside the default judgment. But our review of the record reveals at least two instances in which Alessi was shown to have taken some interest in the operation of Alessi & Bayard.

First, Alessi conceded during the evidentiary hearing that he took certain actions as a partner of Alessi & Bayard once he became aware of Bayard's health problems and his suspension by the State Bar. Specifically, he testified that, in consultation with others in the firm, he asked Ryan Kerbow to step in and assist. Second, Bayard testified that

---

[12]      The availability of relief from a default judgment under section 473.5 where a party does not receive actual notice via substitute service is further reason why we believe section 415.20 does not require a process server to have evidence that the party to be served exercises active management or control of his or her own business enterprise before proceeding by way of substituted service at that business enterprise. As Alessi correctly explains, the same legislation that added the substituted service provisions of 415.20 to the Code of Civil Procedure also added section 473.5 to the code. (Stats. 1969, ch. 1610, § 3, p. 3363; Stats. 1969, ch. 1610, § 23, p. 3373.) The conclusion is inescapable that section 473.5 is intended to be a safety valve of sorts for those rare instances where the reasonable diligence, usual place of business, and person apparently in charge provisions of the substituted service statute do not result in actual notice of the summons and complaint through no fault (i.e., inexcusable neglect) of the party to be served.

30

although he did not "make [] a habit of informing Mr. Alessi of any of the ongoing cases that Alessi and Bayard [were] handling in Diamond Bar," he would have told Alessi about Slauson's malpractice lawsuit "if there was something very unique or interesting about the case," but Bayard did not believe there was. This testimony, along with Alessi's testimony concerning Kerbow, indicates that Alessi's interest in the operation of Alessi & Bayard while negligible was not altogether non-existent. And where one's own business enterprise is at issue, we believe that slight evidence of involvement would suffice, if necessary at all, for purposes of section 415.20.

We accordingly hold Slauson made reasonably diligent efforts to serve Alessi personally before resorting to substituted service at Alessi & Bayard, his own business enterprise and thus his "usual place of business." There is no dispute that the other requirements of section 415.20 were satisfied, including its requirement that the summons and complaint be left with the person apparently in charge. Service of the malpractice complaint was accordingly proper as to Alessi.

### b. Koenig

In contrast to Alessi, the evidence did not establish the Alessi & Bayard firm was Koenig's own business enterprise. Koenig's name was not on the lease for the Diamond Bar Office or on the door of the premises, and there was no evidence to suggest he authorized Bayard to use his (Koenig's) name in forming the firm. Unlike Alessi, Koenig's name was not on the retainer agreement executed with Slauson. Also unlike Alessi, Koenig did not admit during the evidentiary hearing that he was a partner in Alessi & Bayard or that he otherwise had any ownership interest in the firm—in fact, his testimony was emphatically to the contrary. Bayard corroborated Koenig's testimony, drawing a contrast with Alessi: "For Mr. Koenig, Mr. Koenig had even less involvement with Alessi and Bayard. He has had no connection whatsoever, not in name, not—he did—certainly, did not share in any profits, didn't share in any expenses, had nothing to do with the representation." This is substantial evidence supporting the trial court's

31

finding that the Diamond Bar Office was not Koenig's own business enterprise or his customary place of employment. Substituted service of process on Koenig at that office was therefore improper, and all of the arguments offered by Slauson to the contrary are unavailing.

Slauson argues Koenig must be held to be an owner of Alessi & Bayard because he is bound by statements appearing in pleadings filed on his behalf in prior civil litigation. During the evidentiary hearing, Slauson admitted into evidence pleadings filed in *Brien, et al. v. Bayard, et al.*, Los Angeles Superior Court Case No. BC450530 and a related bankruptcy proceeding. The pleadings, including pleadings purportedly signed by Koenig, made representations that Koenig had an ownership interest in Alessi & Bayard. Slauson argues the statements in the pleadings are binding judicial admissions that demonstrate the trial court erred in finding service was invalid as to Koenig.

Contrary to Slauson's contention, statements made in pleadings filed in a prior civil proceeding are not conclusive judicial admissions when offered in a later proceeding. *Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 456 [a "'judicial admission is effective (i.e., conclusive) *only* in the particular case. [Citation.]'"].) In subsequent proceedings, such statements are only evidentiary admissions, such that they may be appropriately explained away by other evidence, including testimony that the admission was inadvertently made or not authorized by the party against whom it is offered. (*Nungaray v. Pleasant Val. Lima Bean Growers & Warehouse Ass'n* (1956) 142 Cal.App.2d 653; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2015) ¶ 8:1237.)

Koenig testified during the evidentiary hearing that he did not sign the documents in the *Brien* matter, and he further testified that "if it ever says that—anywhere in this world that I'm a co-owner of Alessi & Bayard, that would be untrue [be]cause I don't

32

own Alessi & Bayard . . . ." The trial court impliedly if not expressly credited Koenig's testimony on this point, and that finding is supported by substantial evidence.[13]

Slauson also argues Koenig made a general appearance in the malpractice lawsuit, which would wave defects in service of process, because Bayard contracted with appearance attorneys who made appearances on behalf of all defendants. The trial court heard and rejected this argument at the conclusion of the evidentiary hearing, finding that even if the appearance attorneys did make an appearance for all defendants, rather than a special appearance or an appearance just for Bayard and the entity defendant as Bayard intended, such an appearance would have been "ultra vires." The court explained there was nothing to contradict the defendants' testimony during the hearing that the appearance attorneys were not authorized to make appearances on behalf of all defendants, including Koenig. We agree there is no evidence to indicate the appearance attorneys were authorized to appear for Koenig, and we therefore reject Slauson's argument that invalid service of process was waived.

Finally, Slauson argues that Koenig's failure to object when Bayard revealed the existence of the default judgment and said he would attempt to fix the situation "ratified and retroactively authorized and approved all of Bayard's allegedly unauthorized prior conduct in this action . . . ." More specifically, Slauson contends Koenig's failure to stop Bayard from filing the October 7, 2013, motion ratified Bayard's decision to have appearance attorneys contest the entry of default and further ratified Bayard's own appearance on October 7, 2013, which Slauson characterizes as a general appearance. Agency by ratification contains two components: the agent must purport to represent the principal, and the principal must ratify and benefit from the agent's actions. (See 3

---

[13]     Slauson similarly argues admissions made by Koenig during trial court and appellate proceedings in *Villa v. Alessi & Koenig, LLC, et al.*, Los Angeles Superior Court No. BC542923 and Court of Appeal No. B258022, establish Koenig had an ownership interest in Alessi & Bayard. By order dated June 30, 2015, this Court denied Slauson's motion to take judicial notice of the proceedings in the *Villa* matter. We therefore need not address this argument.

Witkin, Summary of Cal. Law (10th ed. 2005) Agency & Employment, § 95, p. 142 and cases cited therein.) Koenig's failure to stop Bayard from filing the October 7, 2013, application and motion was not a sufficient manifestation of assent to constitute an authorization or ratification. Moreover, even if Koenig's failure to object were deemed a ratification of sorts, that ratification would operate only as to the filing of the October 7 motion and application, and those filings were for the limited purpose of seeking relief from default because service was improper, not a general appearance in the prior litigation that would operate to waive defects in the service of process.

Because we hold, as the trial court decided, that service of process was invalid as to Koenig, we affirm the court's decision to grant the November 20, 2013, set aside motion as to Koenig. We confine the discussion that follows solely to the remaining issues involving Alessi.

C.      *The Trial Court Did Not Abuse Its Discretion in Denying Alessi Relief Under Section 473.5*

Alessi contends that the court erred in denying relief under section 473.5 because he did not have actual notice of the malpractice action. He also argues any theory of imputed notice based upon his partnership with Bayard is invalid because actual notice is required before relief can be denied.

A motion to vacate a default and set aside a default judgment is addressed to the sound discretion of the trial court, and in the absence of a clear showing of abuse, the exercise of that discretion will not be disturbed on appeal. (*Anastos v. Lee* (2004) 118 Cal.App.4th 1314, 1318-1319; *Ellard v. Conway* (2001) 94 Cal.App.4th 540, 547.) "On appeal from an order denying a motion for relief from default or a default judgment we will not disturb the trial court's factual findings where, as here, they are based on substantial evidence." (*Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 828.)

Section 473.5 provides "[w]hen service of a summons has not resulted in actual notice to a party in time to defend the action and a default or default judgment has been

34

entered against him or her in the action, he or she may serve and file a notice of motion to set aside the default or default judgment and for leave to defend the action." (§ 473.5, subd. (a).) To be entitled to relief under section 473.5, the defendant must establish "(1) he received through no inexcusable fault of his own, no actual notice of the action in time to appear and defend, and had not made a general appearance; (2) a default or default judgment has been entered against him by the court; (3) he acted with reasonable diligence in serving and filing the notice of motion to set aside the default or default judgment; and (4) he has a meritorious defense." (*Goya v. P.E.R.U. Enterprises* (1978) 87 Cal.App.3d 886, 890-891; accord, § 473.5, subds. (a), (b).)

A motion under section 473.5 must be accompanied by an affidavit or declaration demonstrating the moving party lacked notice of the action in time to defend and the lack of notice "was not caused by his or her avoidance of service or inexcusable neglect." (§ 473.5, subd. (b); *Anastos v. Lee, supra,* 118 Cal.App.4th at p. 1319.) If the court finds that the motion was timely made and that defendant's lack of notice was not due to his or her avoiding service or inexcusable neglect, it may set aside the default judgment and permit trial on the merits. (§ 473.5, subd. (c).)

Actual notice as used in section 473.5 "'means genuine knowledge of the party litigant . . . .' [Citation.]" (*Tunis v. Barrow* (1986) 184 Cal.App.3d 1069, 1077.) Actual notice is strictly construed, "with the aim of implementing the policy of liberally granting relief so that cases may be resolved on their merits. [Citation.]" (*Olvera v. Olvera* (1991) 232 Cal.App.3d 32, 39-40.) Even where a party shows he or she did not have actual notice, though, a motion for relief under section 473.5 should be denied if the lack of notice was caused by the inexcusable neglect of the party. (*Anastos v. Lee*, *supra*, 118 Cal.App.4th at p. 1319 [affirming trial court decision to deny relief under section 473.5 where affidavits failed to establish lack of notice not caused by neglect]; see also *Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 862 [section 473.5 motion properly denied where defendant's affidavit stated only that he had not personally received the complaint and did not show the absence of inexcusable neglect].)

Here, although the trial court found Alessi did not have actual notice of Slauson's malpractice suit until October 3, 2013, which was after the default judgment had been entered, the court found section 473.5 relief was unwarranted because Alessi acted recklessly in doing virtually nothing to monitor or remain aware of the matters handled by Alessi & Bayard at the Diamond Bar Office. This determination was not an abuse of discretion.

By authorizing his name to be used in connection with Alessi & Bayard, and by advertising his connections with the Diamond Bar Office, the trial court reasoned Alessi had an obligation to remain at least generally aware of the matters Alessi & Bayard was handling even under ordinary circumstances. The court also found, however, that the circumstances were not in fact ordinary because Bayard's health problems and State Bar suspension were red flags that imposed a heightened obligation on any reasonable attorney to investigate in greater detail what was transpiring at Alessi & Bayard and whether anything was amiss. Indeed, even Alessi himself recognized he had an obligation as a partner in Alessi & Bayard to take action when the State Bar suspended Bayard, and his response was to "protect the firm" by having Kerbow take over Bayard's cases.

The trial court believed sending Kerbow in was "the very least that could be done," and we agree with that assessment under the circumstances. Bayard provided Kerbow with a list of cases, including the Slauson malpractice suit. But Alessi apparently did nothing to follow up with Kerbow or obtain a briefing on the status of the matters Alessi & Bayard had been handling—if he had, Alessi would have learned of the existence of Slauson's lawsuit from the list Bayard prepared. Bayard also testified that, to his knowledge, Kerbow did nothing with the list of cases he received from Bayard. Although there is no question Bayard made a series of quite poor decisions, it was Alessi's absenteeism and the absence of basic procedures or controls that created the environment in which those decisions could occur and could go unchecked.

36

The fact situation here is therefore not like cases such as *Rosenthal v. Garner* (1983) 142 Cal.App.3d 891, and *Tunis v. Barrow*, *supra*, 184 Cal.App.3d 1069, where the attorney concealed the action from the client and default was taken against the client. In those cases, the court granted relief primarily because the attorney's concealment effectuated a breakdown of the attorney-client relationship. (*Rosenthal v. Garner*, *supra*, at p. 897; *Tunis v. Barrow*, *supra*, at p. 1078.) Here, Alessi was not a passive client kept in the dark; rather, his neglect created a situation where Bayard's mistakes were not only a possibility, but highly likely. Bayard, who was ill and at times suspended, was running an office by himself with no oversight and virtually no assistance.

Alessi devotes only four pages of his briefs on appeal to the trial court's finding that the default judgment was attributable to his own inexcusable neglect. He makes two arguments, neither of which is persuasive. He first contends "there was no credible evidence that Mr. Alessi in any way contributed to his lack of knowledge regarding the lawsuit." We might not use the trial court's phrase, "tsunami of evidence," but we do agree there was more than sufficient evidence such that the court's determination was not an abuse of discretion. Second, he asserts the court's criticism of Alessi's conduct was leveled only with the benefit of hindsight. That is, he argues Alessi had no knowledge of Bayard's health and disciplinary problems at the time the key events were occurring— which in his view was the filing and service of the Slauson lawsuit—because those events occurred only after Slauson effected substitute service. Alessi, however, fails to account for the actual timeline of events in this case. Slauson did not file a request for Alessi's default until February 2013, the trial court did not enter Alessi's default until July 2013, and the court did not enter the default judgment until September 2013. Bayard's first heart attack came in August 2011, over a year before Slauson filed a request for the entry of default, and Bayard's first State Bar suspension began in January 2012, again well over a year before the court entered Alessi's default and approximately 18 months before the court entered the default judgment in this case. If Alessi had exercised due care upon learning of the "red flags" involving Bayard, there was ample time to learn of the Slauson

lawsuit and head off the default. Of course, that is not what happened, and the trial court had a proper basis to find it did not happen because of Alessi's inexcusable neglect. That neglect bars relief under section 473.5. (§ 473.5, subd. (c).)

D.	*The Trial Court Did Not Abuse Its Discretion in Denying Alessi Relief Under Section 473*

Alessi argues that he is entitled to relief from default under section 473, subdivision (b)'s provisions for mandatory relief due to attorney fault. He argues the default judgment is attributable solely to Bayard's "mistakes." Slauson responds that Alessi is not entitled to relief because he is not free from fault himself.

Section 473, subdivision (b) mandates relief if the default was taken as a result of the attorney's fault. "Relief is mandatory when a complying affidavit is filed, even if the attorney's neglect was inexcusable." (*Rodrigues v. Superior Court* (2005) 127 Cal.App.4th 1027, 1033.) Mandatory relief, however, is confined to situations in which the attorney, rather than the client, is the cause of the default, default judgment, or dismissal. (Compare, e.g., *Hu v. Fang* (2002) 104 Cal.App.4th 61, 64 [fault of paralegal supervised by attorney sufficient to warrant relief] with *Todd v. Thrifty Corp.* (1995) 34 Cal.App.4th 986, 991 [no relief where fault attributable to client].) "When a default [or dismissal] is the attorney's fault the court must grant a timely noticed motion for relief. The only limitation is when the court finds [that] the default [or dismissal] was not in fact the attorney's fault, for example when the attorney is simply covering up for the client." (*Rogalski v. Nabers Cadillac* (1992) 11 Cal.App.4th 816, 821.)

The first problem with Alessi's argument is the absence of evidence to indicate Bayard was Alessi's attorney. Alessi concedes in his opening brief that "Bayard has not officially appeared for Alessi or Koenig." Indeed, Alessi testified he was not aware of Slauson's malpractice lawsuit until October 3, 2013, after the default judgment had already been entered. An attorney-client relationship therefore could not have existed before then, at least absent facts we do not see in the record. (*Koo v. Rubio's*

38

*Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 730-732 [no attorney-client relationship where client had not agreed expressly or impliedly to be represented by attorney].) Because Bayard was not Alessi's attorney before the entry of default or the default judgment, Alessi by definition cannot take advantage of the attorney fault provisions of section 473, subdivision (b).

Furthermore, and in any event, the trial court did not abuse its discretion in concluding Alessi is not entitled to relief under section 473 because the default judgment is attributable to his own inexcusable neglect. In *Cisneros v. Vueve* (1995) 37 Cal.App.4th 906, the plaintiff's default was taken, but this occurred before the plaintiff's insurance carrier retained an attorney to represent him. The trial court denied relief from default under section 473, subdivision (b) even though the insurance attorney filed an affidavit of fault in which he stated that he had started to work on a motion to set aside the default, but had been distracted by other matters. (*Id.* at p. 908.) The court found that the default was not caused by the attorney because the default occurred before the attorney was retained, and hence the client was not entitled to relief. (*Id.* at p. 912; see also *Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 916; *Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1250-1251 [client implicated in discovery wrongdoing not entitled to relief under Section 473 because mandatory relief provisions only protect innocent client]; *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622-623 [client at fault].)

For the same reasons we have already detailed in connection with the motion to set aside the default and default judgment under section 473.5, we see no abuse of discretion in the trial court's determination that Alessi's own inexcusable neglect was an independent cause of the default judgment. His near total failure to maintain a basic awareness of what was transpiring at Alessi & Bayard despite advertising his connections to that office to the public at large was not reasonably prudent. It also was why he remained unaware of Slauson's malpractice suit until a default judgment had been entered and it was too late to defend.

39

*E.*     *The Default Judgment is Not Void for Failure to File a Statement of Damages or for Awarding "Grossly Excessive Damages"*

Alessi asserts that the judgment must be set aside because Slauson did not file a statement of damages before seeking the default judgment and because the damages awarded were excessive, including an award of attorneys' fees under a "tort of a third party" theory.

Substantively, a default confesses the material allegations of the complaint. "[T]he defendant's failure to answer has the same effect as an express admission of the matters well pleaded in the complaint." (*Steven M. Garber & Associates v. Eskandarian* (2007) 150 Cal.App.4th 813, 823.) In entering a default judgment, the court must enter judgment for that relief "as appears by the evidence to be just." (§ 585, subd. (b).) In that regard, the plaintiff must introduce sufficient evidence to support his or her claim, and the court must ensure the judgment is not in excess of the amount pleaded in the complaint. (*Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 868.)

Defaults may be proven by affidavits or declarations. (§ 585, subd. (d).) Because liability has been conceded, the only evidentiary facts the plaintiff must put forth are those related to damages. (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 899-900.) We therefore review the default judgment for sufficiency of the evidence related to the amount of damages only. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 286-287; see also *Harbour Vista, LLC v. HSBC Mortg. Services Inc.* (2011) 201 Cal.App.4th 1496, 1503, fn. 6 [plaintiff is not required to prove damages in support of a default judgment by a preponderance of the evidence; rather, the evidence submitted by a plaintiff is sufficient if it establishes a prima facie case for the damages sought].)

Here, the trial court held a default judgment prove-up hearing on September 16, 2013, and found Slauson's evidence of damages sufficient. No statement of damages was required in this case because it is a legal malpractice action and no damages were sought for personal injury or wrongful death. (*Levine v. Smith* (2006) 145 Cal.App.4th 1131,

40

1137.)  Instead, Slauson was limited to the damages pleaded in the complaint.  (*Kim v. Westmoore Partners, Inc.*, *supra*, 201 Cal.App.4th at p. 286.)  Although the prayer contained no plea for damages, specific damages allegations were made in the body of the complaint regarding Slauson's loss due to the foreclosure sale:  "Plaintiffs reasonably calculate that its damages arising from Defendants' wrongful conduct amounts to more than $1,000,000."  This allegation of damages was sufficient to support the default judgment entered, which did not exceed $1,000,000.  (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 829-830.)

Alessi also objects to attorneys' fees he asserts the trial court awarded under the "tort of a third party" theory.  His claim is that the complaint was required to specify these damages separately from the overall damage calculation it did include.  Alessi cites no authority holding such damages must be specified separately.  We therefore consider the argument waived.  (*Berger v. California Ins. Guarantee Ass'n* (2005) 128 Cal.App.4th 989, 1007.)

### F.     The Complaint Is Sufficient to Support the Judgment

Alessi contends the complaint is insufficient to support the default judgment because: it alleged that a non-existent entity, Alessi, Koenig & Bayard was the entity performing services, the complaint failed to state whom the plaintiffs spoke to when they retained defendants' services, and the complaint failed to attach the retainer agreement between Slauson and the defendants.  Alessi also asserts the complaint on its face establishes that it was barred by the statute of limitations because it alleged the retainer agreements were made on May 6, 2009, and October 28, 2009, and the deficient legal advice was rendered in January 2010, yet the complaint was not filed until March 2011.

As to the first of these claims, and assuming this argument is properly before us without a notice of appeal having been filed on behalf of the named entity defendant, the argument fails.  The complaint averred "Alessi, Koenig, and Bayard" was also known as Alessi & Bayard and Alessi & Koenig.

41

Second, the complaint is sufficient to state a claim for legal malpractice and breach of fiduciary duty.  The elements of a cause of action for professional negligence are "(1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820-821.)  In the malpractice complaint, Slauson alleged the named defendants—acting by and through Bayard and defendant Walter Hackett—advised them not to cure the loan default and then failed to file a lawsuit to enjoin foreclosure proceedings despite their representations they would do so.  These allegations state a cause of action for professional negligence, and it was unnecessary to attach a copy of the retainer agreement between Slauson and Alessi & Bayard.  (Cf. *Miles v. Deutsche Bank National Trust Company* (2015) 236 Cal.App.4th 394, 401-402.)

Finally, the malpractice complaint is not barred by the statute of limitations on its face.  Pursuant to section 340.6, subdivision (a), an attorney malpractice action "shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first."  On its face, section 340.6, subdivision (a) states "'two distinct and alternative limitation periods: one year after actual or constructive discovery, or four years after occurrence (the date of the wrongful act or omission), whichever occurs first.'"  (*Samuels v. Mix* (1999) 22 Cal.4th 1, 7.)

Section 340.6, subdivision (a) incorporates tolling provisions, stating:  "[I]n no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that any of the following exist:  [¶]  (1) The plaintiff has not sustained actual injury.  [¶]  (2) The attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred.  [¶]  (3) The attorney willfully conceals the facts constituting the wrongful act

42

or omission when such facts are known to the attorney, except that this subdivision shall toll only the four-year limitation. [¶] (4) The plaintiff is under a legal or physical disability which restricts the plaintiff's ability to commence legal action." With the exception of subdivision (a)(3), the tolling provisions apply to both the one-year and four-year limitations periods. (*Bennett v. McCall* (1993) 19 Cal.App.4th 122, 126.) The burden is on the defendant to establish when a client discovered, or through the use of reasonable diligence should have discovered, the facts constituting alleged legal malpractice, for purposes of applying the one-year-from-discovery limitation on commencement of attorney malpractice actions. (*Samuels v. Mix, supra,* 22 Cal.4th at p. 8.)

The malpractice complaint includes no allegation concerning when the attorney-client relationship terminated such that the accrual of the statute can be pinpointed precisely. Given that the burden is on defendants to establish the date of discovery for purposes of application of section 340.6, and the record herein indicates that defendants continued to represent plaintiffs until shortly before the complaint was filed in March 2011, the complaint is not facially defective under the applicable statute of limitations.

### G. *Reversal Is Not Warranted for a Purported Error in Service of the Request for Entry of Default*

Alessi finally contends that the default and default judgment must be set aside because the request for entry of default was improperly served. He points to the proof of service for the request, which contains a typographical error in the address for the Diamond Bar Office. When confronted with this argument, the trial court impliedly if not expressly found the request for entry of default was properly served. Substantial evidence, specifically the testimony of Stacy Larson, supports that finding.

43

DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.


We Concur:


KRIEGLER, Acting P.J.


KUMAR, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.